21 U.S. 371
 5 L.Ed. 639
 8 Wheat. 371
 The PITT.
McNUTT, Claimant.
 March 1, 1823
 
 APPEAL from the Circuit Court of Delaware. This was an allegation of forfeiture in the District Court of Delaware, against the British sloop Pitt, under the Non-Intercourse Act of April 18th, 1818, c. 65. the first section of which provides, 'that, from and after the 30th of September next, the ports of the United States shall be, and remain closed against every vessel, owned wholly, or in part, by a subject or subjects of his Britannic majesty, coming, or arriving from, any part or place in a colony or territory of his Britannic majesty, that is, or shall be, by the ordinary laws of navigation and trade, closed against vessels owned by citizens of the United States; and such vessel that, in the course of the voyage, shall have touched at, or cleared out from, any port or place in a colony or territory of Great Britain, which shall, or may, by the laws of navigation and trade aforesaid, be open to vessels owned by citizens of the United States, shall, nevertheless, be deemed to have come from the port or place in the colony or territory of Great Britain, closed as aforesaid against vessels owned by citizens of the United States, from which such vessel cleared out and sailed, before touching and clearing out from an intermediate and open port or place as aforesaid; and every such vessel, so excluded from the ports of the United States, that shall enter, or attempt to enter, the same, in violation of this act, shall, with her tackle, apparel, and furniture, together with the cargo on board such vessel, be forfeited to the United States.'
 The vessel in question, belonging to British subjects in the island of Jamaica, departed from the port of Kingston, in that island, on the 16th of August, 1818, with a cargo belonging to the same owners, and a clearance for San Blas, and arrived at Old Providence, a small Spanish island on the coast of Honduras, on the 22d of the same month. At this island the cargo was discharged, and another taken in, consisting principally of Caraccas cocoa, fustic, and Spanish hides. She sailed from thence on the 6th of September following, with orders to come to anchor off the light house at Cape Henlopen, the western cape of the Delaware bay, and there wait instructions from the agents of the owners at Philadelphia. The vessel arrived off Fenwick's island, about 30 miles south of the Delaware, on the 29th of September, 1818, when a pilot boarded her, and delivered to the master written instructions from the agents of the owners, not to enter the Delaware, but to proceed to Halifax or Bermuda. But the master stated, that his bread and water were insufficient for the voyage, and proceeded off the capes of the Delaware to procure a supply of those articles, but was compelled (as alleged) by stress of weather, on the 1st of October, 1818, to put into the Whorekiln Roads opposite to Lewiston, where the vessel was seized by the officers of the revenue for a breach of the act before mentioned.
 The District Court pronounced a decree of condemnation, which was reversed in the Circuit Court, and the cause was then brought by appeal to this Court.
 Feb. 27th.
 Mr. Jones, for the appellants, made the following points.
 1. That the vessel, together with the cargo on board, was liable to forfeiture, as coming from Kingston, a closed and prohibited British port, within the true intent and meaning of the act of Congress: and that it is immaterial whether the voyage were direct, or a circuitous and trading voyage: whether it were a passage upon the seas from one port to another, or to several ports: in either case, Kingston was the terminus a quo. That she entered a port of the United States after the 30th of September, 1818, which consummated the forfeiture.
 2. That the plea of distress, under which the entry was made, was wholly fictitious.
 Mr. Sergeant and Mr. McLane, contra, argued, (1.) That the act excluded a vessel from the ports of the United States only, 1st. When she is coming directly from a prohibited port, in a colony or territory of Great Britain, to the United States; and, 2dly. When she is coming from such prohibited port, and touches at, and clears out from, a port in a colony or territory of Great Britain, which may be open to the vessels of the United States; and the voyage of the Pitt was of neither character. If she had sailed from Jamaica, which was closed against vessels of the United States, and had touched at, and cleared out from, any intermediate port in a colony or territory of Great Britain, open to vessels of the United States, she would have been excluded by the law; but, having sailed from Jamaica to a Spanish port, and thence, with a new cargo, to the United States, conditionally, her voyage was not prohibited. The object of the navigation act was to deprive British vessels of an indirect trade with the United States, through certain of their own ports, which they might leave open for that purpose, but it never designed to interfere with the direct or indirect trade with Spain or her colonies.
 The commercial convention concluded between the United States and Great Britain, on the 3d of July, 1815, did not extend to the British colonies in the West Indies; but, as to them, the navigation laws and colonial system of Great Britain continued in full force, which the United States were at liberty to counteract by any regulations in their power. It was for this purpose the act of Congress was passed. It contemplated a partial, not a general, non-intercourse system. It did not, of course, exclude the entrance of an English vessel, whether documented at home or in a colony, coming with a cargo of British manufactures or colonial produce, from any other than a prohibited place, without having touched at, in the course of her voyage, any free port in the British colonies. Any article produced in the interdicted colony, may be imported into the United States, in a lawful way, from permitted ports in England, or her colonies, and, a fortiori, from the ports of any other foreign state. Such was the case of the Pitt; she cleared from Kingston for San Blas,. and arrived at Old Providence, a Spanish island; there she discharged her cargo, took in another of a different character, and sailed thence to proceed to Philadelphia or Halifax, as circumstances might warrant. Her ultimate destination was not to be determined until her arrival off the coast of the United States, whither she could lawfully come. She was not on a direct voyage from a prohibited port to the United States, nor had she touched at and cleared out from a free port in the British colonies; nor was she even laden with a cargo of the growth or produce of the prohibited colonies.
 2. The vessel did not enter, or attempt to enter, the ports of the United States, in violation of the act of Congress.
 This is a penal law, and is, therefore, to be construed strictly. Its general scope and design is to prohibit the trade between the United States and the British ports, in British vessels; but where the entrance into the waters of the United States is not for the purpose of trade, or where it is compulsory and not voluntary, or where it is occasioned by necessity or stress of weather, it is not a violation of the law.a There was evidently no intention, in any part of the voyage, to violate the law; and every reasonable precaution was taken to comform to and respect its provisions. The object of the vessel, in coming off the coast of Delaware, was not to enter the waters of the United States, but to receive instructions as to her ulterior destination. This it was lawful to do. This Court has decided, that even under the rigorous non-intercourse system of 1809, a vessel from Great Britain had a right to lay off the coast of the United States, to receive instructions from her owners in New-York; and, if necessary, to drop anchor; and, in case of a storm, to make a harbour; and, if prevented by her crew from putting to sea again, might wait in the waters of the United States for provisions.b This is the case, therefore, of a vessel bound from a Spanish to a British port, accidentally forced into the waters of the United States, for lawful purposes, and there prevented, by the officers of the United States, from prosecuting her voyage. The testimony in the case proves the necessity to be sufficiently urgent to authorize the entrance of the Pitt into the waters of the United States, under all circumstances, without violating the law; and though the act of Congress designed to prohibit the trading of British vessels with the United States, from the colonies of Great Britain, it could not have intended to deny the ordinary offices of humanity to such vessels, trading with other nations.
 Mr. Jones, in reply, insisted, that the case was one of a fraudulent evasion of the act. The moment the onus probandi is thrown on a claimant, who, in a revenue cause, sets up a plea of distress to excuse the infraction of the law, he must show by the clearest evidence, that the necessity, under the compulsion of which he professes to have acted, was real.c Entering the port, infra fauces portus, is not necessary; and there is more danger to the revenue laws in vessles coming into these by-places, than of their entering ports which are made such by statute. The present voyage is within the mischiefs intended to be guarded against by the prohibition of an indirect voyage, which are as great where the voyage is through a foreign port (not British) as through a British port not closed against our trade.
 March 1st.
 Mr. Justice JOHNSON delivered the opinion of the Court.
 
 
 1
 This vessel, with her cargo, was condemned in the District Court of Delaware, for a violation of the act of April, 1818, entitled, 'an act concerning navigation.' That decree having been reversed in the Circuit Court, the cause is now brought up by appeal to this Court.
 
 
 2
 Several grounds, in support of the latter adjudication, have been insisted on in the argument; but the Court deem it unnecessary to advert to more than one, as that will dispose of the case finally, and fix the most important point which it presents, to wit, the correct construction of the first section of the act in question.
 
 
 3
 We are unanimously of opinion, that the construction insisted on by the claimant's counsel, is the only correct construction. It is perfectly clear, that the case of this vessel is not literally comprised within the provisions of this act; for it only prohibits a voyage from a closed port of Great Britain to a port of the United States; and the purport and effect of the latter part of the first clause, amounts to no more than a declaration, that the continuity of such a voyage shall not be broken by the act of touching at, or clearing out from, any port of a colony or territory of Great Britain which may be open to American shipping.
 
 
 4
 But it has been contended, in behalf of the appellants, that although not within the letter, it is within the mischief intended to be obviated by the statute, and, therefore, subject to the penalty.
 
 
 5
 If by this argument it be intended to maintain, that acts done in fraud of a law, are acts in violation of the law, the principle may be conceded; but we fully concur in the views of the policy of this law, as explained by the claimant's counsel, and are satisfied, that the latter provisions of the first clause were solely intended to guard against the effects which the permission of a general trade at one or more of the British colonial ports, may have had in defeating the policy of the act altogether. The Legislature had not in view a fair unaffected trade through the ports of any other nation. It is obvious, that attempts might have been made to evade the law by an affected trade through an intermediate port; and it is not to be supposed, that this government, or its Courts, would have failed to check such an attempt; but we are fully satisfied, that this was not such a case. The evidence of fairness is full and unequivocal. There was time, even upon ordinary calculation, to have completed the voyage from Jamaica to Old Providence, and thence to Philadelphia, before the prohibition was by law to take effect, as is proved by the fact of her having arrived in the Delaware at a time which left it doubtful whether she was or was not within the period specified for its suspension. The cargo, too, was taken in at the port of Old Providence, and was of a description well known to belong to the trade of that port, from its having been the depot of captures, and probably of a convered trade from the continent of South America. Every thing conspires to exempt the vessel from the charge of fraudulent intention, and, therefore, leaves no ground for the condemnation.
 
 
 6
 Decree of the Circuit Court affirmed.
 
 
 
 a
 The Concord, 9 Cranch's Rep. 387.
 
 
 b
 The Fanny, 9 Cranch's Rep. 181.
 
 
 c
 The Josefa Segunda, 5 Wheat. Rep. 354. The New-York 3 Wheat. Rep. 65.